FILED
MARY L. SWAIN
BUTLER COUNTY
CLERK OF COURTS
11/01/2022 03:59 PM
CV 2022 11 1813

**IN THE COURT OF COMMON PLEAS**
**BUTLER COUNTY, OHIO**

| | |
|---|---|
| TERRI DAVENPORT<br>1576 Pleasant Run Dr., Apt. 03<br>Cincinnati, OH 45240<br><br>          Plaintiff,<br><br>       v.<br><br>BIO-MEDICAL APPLICATIONS OF<br>OHIO, INC.<br>d/b/a FRESENIUS MEDICAL CARE<br>4750 Dixie Hwy.<br>Fairfield, Ohio 45014<br><br>**Serve Also:**<br>Bio-Medical Applications of Ohio, Inc.<br>d/b/a Fresenius Medical Care<br>c/o CT Corporation System (Stat. Agent)<br>4400 Easton Commons Way, Suite 125<br>Columbus, OH 43219<br><br>         Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO.<br><br>JUDGE:<br><br>**COMPLAINT FOR DAMAGES**<br>**AND INJUNCTIVE RELIEF**<br><br>**JURY DEMAND ENDORSED**<br>**HEREIN** |

Plaintiff Terri Davenport, by and through undersigned counsel, as her Complaint against

the Defendant, states and avers the following:

**PARTIES**

1. Davenport is a resident of the city of Cincinnati, Hamilton County, state of Ohio.

2. Defendant BIO-MEDICAL APPLICATIONS OF OHIO, INC. d/b/a FRESENIUS
   MEDICAL CARE ("Fresenius") is a foreign-incorporated company that conducts business
   within Ohio.

3. At all times referenced herein, Fresenius was Davenport's employer within the meaning of
   Ohio R.C. §4112.01(A)(2) and Title VII.

**EXHIBIT B**

4. A substantial part of the events or omissions giving rise to Plaintiff's claims occurred at 4750 Dixie Hwy., Fairfield, Ohio 45014.

5. All of the material events alleged in this Complaint occurred in Butler County, Ohio.

6. Therefore, personal jurisdiction is proper over Defendant pursuant to R.C. §2307.382(A)(1) and/or (4).

7. Venue is proper pursuant to Civ. R. 3(C)(3) and/or (6).

## FACTS

8. Davenport is a former employee of Defendant.

9. Davenport is African American and a woman, therefore in protected classes for race and sex/gender.

10. Davenport worked for Fresenius as a Certified Dialysis Technician from September 17, 2019, until Fresenius unlawfully constructively terminated Davenport's employment on or about January 23, 2022.

11. During her time at Fresenius, Davenport faced repeated instances of race discrimination, sex/gender discrimination, sexual harassment, and retaliation.

12. Davenport began her time with Fresenius at the Kenwood location and was there for about six months.

13. Around Summer 2020, Davenport told manager Rebecca LNU that she was looking to enroll in nursing school.

14. Rebecca LNU discouraged Davenport, saying it wouldn't be a good fit for the employer at the time.

15. However, Davenport informed her she already applied and was going to do so.

2

**EXHIBIT B**

16. Following this conversation, Davenport's hours were suddenly cut down to one day per week. She needed to float among different sites to make up her lost hours.

17. While Davenport was at the Fairfield site, manager Daphne Jones told her she had an open spot.

18. Davenport and Jones had a semi-formal interview process, and the next time at the Kenwood site, Rebecca LNU gave Davenport the transfer documents.

19. By November 2020, Davenport had been working at the Fairfield site and everything was going well.

20. However, Davenport started having issues with a patient ("name withheld").

21. One day, dialysis technician Bryan LNU told Davenport that (name withheld) thought she was pretty.

22. Davenport said thanks and went on with her day. However, after this comment, (name withheld) adopted the habit of staring at Davenport while she worked.

23. Davenport reported this soon after to Jones, making a protected complaint of sexual harassment.

24. In early 2021, dialysis technician Owen LNU came up to Davenport to tell her (name withheld) said she is very beautiful.

25. Davenport told Owen LNU that (name withheld) was making her uncomfortable, but said thanks anyway, and went back to work.

26. (Name withheld) kept staring at her, so Davenport reported this to Jones again, making another protected complaint of sexual harassment, but Jones just laughed it off.

27. Jones then placed (name withheld) in Davenport's pod so that Davenport was now (name withheld)'s caregiver – an adverse action meant to discourage other reports of harassment.

3

**EXHIBIT B**

28. Davenport didn't want to work with him, so she switched pods with dialysis technician Decarra LNU. Jones was aware of this switch.

29. (Name withheld) was a long-time patient at Fresenius which Davenport believed was why Jones was afraid to take action against him.

30. (Name withheld) continued to leer at Davenport going forward, and she was left to avoid him the best she could.

31. In Spring 2021, (name withheld) brought in chicken for the staff, which Jones placed in the break area.

32. (Name withheld)'s treatment lasted four hours, so he waited for Davenport and asked if she could bring him some of the chicken.

33. Davenport told Jones and asked her to get it instead. Jones left but returned to tell her there was none left.

34. Jones later then came to Davenport to ask what this incident was about.

35. Davenport told her that (name withheld) was manipulating her and deliberately waiting for Davenport to ask her to bring him chicken, instead of eating it earlier when he brought it.

36. Around Autumn 2021, (name withheld) stopped Davenport in the waiting area while she was working on another patient.

37. (Name withheld) told her, "Back in the day, I would've given my right eye and my right arm to be with a woman like you."

38. Davenport told him he was being inappropriate, and she didn't appreciate his conduct. She then emphasized she was there to work only.

39. (Name withheld) walked away, seemingly mad at Davenport. The staring problem continued after this.

4

**EXHIBIT B**

40. Davenport reported (name withheld) to Jones yet again, making another protected complaint.

41. Following this incident, (name withheld) would watch for anything Davenport did that could be considered a mistake and reported it to Jones.

42. Davenport was talked to repeatedly by Jones because of these complaints.

43. (Name withheld) also intentionally manipulated his arm when on the dialysis machine to stop it from working. He did this at the end of Davenport's shift to force her to interact with him more.

44. Davenport reported this to RN Danita LNU, making another protected complaint.

45. Danita LNU took over his care to limit Davenport's interaction with him.

46. Around October 2021, after telling Jones she would quit if she wasn't given something, Davenport signed a retention agreement with Fresenius.

47. After signing, Davenport reported Jones to regional manager and director of operations, Jeff Lauston.

48. Davenport reported that Jones would place RNs and LPNs in pods to meet requirements but wouldn't actually make them work.

49. After this, Fresenius pulled the half bonus Davenport was to receive in November.

50. Jones approached Davenport a few days later and asked about the complaint she made.

51. Davenport asked if it would affect her bonus to tell her, to which Jones responded she didn't get a bonus.

52. Jones then lowered her bonus to $1,000 but paid the remainder in the following pay period.

53. On or around December 17, 2021, Davenport was caring for a patient and removing them from the dialysis machine.

5

**EXHIBIT B**

54. As Davenport did this, she looked for Danita LNU and noticed (name withheld) had his arm extended in the air with his phone in his hand.

55. It looked as if (name withheld) was taking a picture or video of Davenport, but once he saw her looking, he put the phone down.

56. Davenport reported this through a text message to Jones, who directed her to social worker Stephanie LNU.

57. Davenport reported again to Stephanie LNU. These were both protected complaints. Stephanie LNU recommended that Davenport leave for the day.

58. At this point, Davenport was in tears and said she couldn't leave Danita LNU alone and needed to return to work.

59. Davenport then reported the situation to Danita LNU as well. Danita LNU ended (name withheld)'s treatment.

60. Danita LNU told him he was making the work environment uncomfortable and unsafe, to which he asked what she thought ending his treatment would do. (Name withheld) left after this.

61. Jones then offered to transfer Davenport and said she would talk to Lauston about the situation.

62. The following Monday, Davenport came in for a regular day. (Name withheld) came in for an appointment and Jones came in shortly after.

63. Jones started giving Davenport the cold shoulder. About half an hour later, Jones came up to Davenport, rubbed her shoulders, and said she "moved his time up."

64. Davenport told her that wasn't good enough, and that she needed to be away from (name withheld). However, Jones ignored her.

6

**EXHIBIT B**

65. The next day, on or around December 21, Davenport emailed Stephanie LNU, Jones, and Lauston saying she was being sexually harassed, she was uncomfortable working at this site, and she wanted to transfer. This was another protected complaint.

66. On or around December 22, Jones sent Davenport into a meeting with HR manager Gina Caputo.

67. Davenport told Caputo she wanted to transfer, but Caputo replied that it was hard to transfer workers at the current time.

68. Davenport then asked her to transfer (name withheld), but Caputo said the same thing.

69. Davenport told Caputo she was not comfortable being in the same building with him and asked what her options were.

70. Caputo then offered an escort for Davenport and said she would float between clinics as time went on.

71. The next day, Davenport had a Zoom meeting with Jones and Lauston.

72. Lauston asked her about tuition reimbursement, to which Davenport had applied before the sexual harassment started.

73. On or around December 12, Jones asked for her schedule because they needed it to approve the tuition reimbursement.

74. Davenport had been delaying this until the situation with (name withheld) resolved. Lauston asked for the schedule again during this meeting.

75. Davenport said this was a set up against her because they wouldn't deal with (name withheld).

**EXHIBIT B**

76. Davenport then pointed out that Fresenius had let two Caucasian employees, Kelly Templeton and Cara Crockett, transfer without any issue. This was a protected complaint of race discrimination.

77. Lauston agreed and told Davenport they would let her transfer out to a floater position on January 1, before she found a new site within the company. She also would not be on the third shift.

78. On or around December 24, Davenport saw the schedule and found she was working an extra day on the week after Christmas, and working through January 8, closing almost every day.

79. Davenport confronted Jones and said this was against what they had agreed on, but Jones just told her to talk to Lauston.

80. Because all of her protected complaints were ignored, Davenport instead said she would go to the EEOC. This was another protected complaint.

81. Davenport returned to the floor to work, but after a few minutes, Jones told her to clock out and go home – an adverse action against her. Davenport left.

82. On or around December 26, Davenport texted Jones to ask if she was working that day but didn't get a response.

83. Davenport went to work, but her code didn't work, and she couldn't get in the building.

84. Davenport tried calling both Jones and the clinic but didn't get any response.

85. Davenport left and came back later in the day and met Danita LNU at the door.

86. Davenport told her she needed to talk to Jones, but Danita LNU told her Jones wasn't available.

87. Davenport once again called Jones and asked her if her employment was terminated.

8

**EXHIBIT B**

88. Jones only told her that HR would talk to her soon.

89. Davenport said fine, and that she would use PTO for the days she wasn't allowed to work.

90. Jones didn't put in the PTO, and Davenport had to have Lauston do it later on.

91. The following Monday, Caputo called Davenport and asked why she went to the clinic.

92. Davenport responded that it was on her schedule and that she felt Fresenius was trying to set up a job abandonment claim or say she caused a scene and push her out.

93. Caputo asked for her call and text records of that day, which Davenport provided.

94. Following this, from December 26 to January 6, Davenport was not allowed to work at all. Jones had removed her from the schedule.

95. Lauston reached out to Davenport on or around January 6 to work the next day.

96. At this point, Davenport started looking for new jobs, recognizing she was off for two weeks without a reason – an adverse employment action against her.

97. On or around January 9, Davenport felt she had no options left and submitted her resignation to Lauston, effective January 23.

98. After a few texts back and forth, Lauston spoke by phone with Davenport and said he saw that she resigned. He said she signed a contract and Fresenius could sue her for the retention bonus given in October. This was an adverse action against Davenport.

99. Davenport pointed out he wrote the contract and breached it himself with the payment issues. At this point, Lauston tried changing topics.

100.    Davenport asked if PTO would be used for the days she wasn't allowed to work, to which Lauston said yes and put her PTO towards those days.

9

**EXHIBIT B**

101.      During the week of January 17-21, Davenport was exposed to COVID-19 at work and had to quarantine. She did not return for her final day on or around January 23, 2022, due to her quarantine.

102.      Two Caucasian employees, Kelly Templeton and Cara Crockett, were allowed to transfer without any issues.

103.      However, when Davenport wanted to transfer due to the severe sexual harassment she was facing, she was told it wasn't possible by Caputo.

104.      Davenport was given vague answers for months before she was told she would be able to transfer January 1.

105.      However, Davenport never was able to take this transfer due to a variety of issues that would present themselves.

106.      (Name withheld) sexually harassed Davenport based on her sex/gender as a woman. He would not treat a man in the same way.

107.      Fresenius did not stop (name withheld) from sexually harassing Davenport (or take any other useful remedial actions), therefore condoned his behavior and engaged in sex/gender discrimination.

108.      Davenport suffered constant sexual harassment from (name withheld).

109.      (Name withheld) would stare at her, send her messages through her coworkers, say inappropriate things to her, obstruct the dialysis equipment to force her to help him, take photos/videos of her, and generally harass her in a way that obstructed her ability to do her job.

110.      When Davenport told him he was being inappropriate and to stop, he started making constant complaints about her, for which Davenport was punished.

10

**EXHIBIT B**

111.    Throughout all of this, Davenport made constant protected complaints to Fresenius. However, her complaints were consistently ignored.

112.    It became Davenport's responsibility to avoid (name withheld) at work, and she wasn't allowed to even transfer to avoid him.

113.    Rather, Jones had even scheduled him specifically to her pod after her complaint in early 2021.

114.    In early 2021, Davenport reported (name withheld)'s sexual harassment to Jones.

115.    Soon after, Jones placed (name withheld) in Davenport's pod to be under Davenport's care. This was an adverse action against Davenport.

116.    Davenport continued making protected complaints about (name withheld)'s sexual harassment throughout her employment.

117.    However, Davenport found herself being scheduled for extra days around the holidays, closing every day, and losing bonuses.

118.    Davenport eventually filed a Charge with the EEOC in or around late December 2021. Davenport gave Jones notice of this Charge.

119.    On or around December 26, 2021, only two days later, Davenport was locked out of the building and not able to work – an adverse action against her.

120.    Davenport called Jones and the clinic about this and was only given vague answers.

121.    Then, through January 6, 2022, Davenport was not allowed to work at all. By January 9, 2022, Davenport, and any reasonable person in Davenport's position, felt she was being pushed out of her job, and had no choice but to resign.

122.    Upon information and belief, Davenport was replaced by someone outside of her protected class.

**EXHIBIT B**

123.     Davenport's constrictive termination was an adverse employment action by Defendant.

124.     Davenport was discriminated against and sexually harassed due to her sex/gender, and due to her opposition to her patient's sexual advances.

125.     Davenport was retaliated against for making complaints of discrimination and sexual harassment in the workplace.

126.     Davenport was actually terminated due to her sex/gender, for refusing patient's sexual advances, and/or in retaliation for making complaints of discrimination and sexual harassment in the workplace.

127.     There was a causal connection between Davenport's protected classes (gender/sex and race) and complaints and Defendant's adverse actions taken against Davenport.

128.     Defendant's purported reason for Davenport's termination is pretext for gender/sex discrimination, race discrimination, and/or retaliation for making complaints of discrimination and sexual harassment in the workplace.

129.     As a result of being treated disparately and being sexually harassed during her employment with Defendant, and being terminated from Defendant, Davenport has had and continues to accrue damages based thereupon.

## COUNT I:  SEXUAL HARASSMENT

130.     Davenport restates each and every paragraph of this Complaint as though it were fully restated herein.

131.     Davenport was subjected to unwelcomed sexual harassment in the form of sexual comments, inappropriate sexual gestures, and sexual advances from her patient.

**EXHIBIT B**

132.     Defendant created and sustained an environment of severe and pervasive sexual harassment in the form of unwelcomed sexual comments, inappropriate sexual gestures, and sexual advances.

133.     As a direct and proximate result of the intimidating, offensive and hostile environment created and sustained by Defendant, Davenport reported the sexual harassment to Defendant.

134.     Defendant's actions amount to discrimination on the basis of sex through the creation of a hostile work environment in violation of R.C. §4112.02(A) and Title VII.

135.     The sexual harassment against Davenport occurred while she was acting in the course and scope of her employment at Defendant.

136.     Defendant had knowledge of this harassment and failed to take any corrective or remedial action.

137.     During her employment with Defendant, Davenport was subjected to offensive and sexually harassing conduct.

138.     Defendant knew or should have known of the offensive, harassing conduct against Davenport.

139.     Defendant condoned, tolerated, and ratified this offensive, harassing conduct.

140.     This offensive, harassing conduct was severe and/or pervasive.

141.     This offensive, harassing conduct was offensive to Davenport.

142.     This offensive, harassing conduct would also be offensive to any reasonable person.

143.     This offensive, harassing conduct interfered with Davenport's ability to perform her job duties.

144.     This offensive, harassing conduct was based on Davenport's sex/gender.

**EXHIBIT B**

145.     This offensive, harassing conduct was so severe and pervasive that it materially altered the conditions of Davenport's employment.

146.     Any reasonable person in Davenport's place would also have no choice but to resign due to the conduct.

147.     Defendant treated Davenport differently than other similarly-situated employees based on her sex/gender.

148.     Davenport, with no other reasonable choice, was then forced to resign her employment.

149.     Davenport's resignation was a constructive termination, an adverse employment action.

150.     Defendant constructively terminated Davenport's employment.

151.     As a direct and proximate result of Defendant's conduct, Davenport has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages

## COUNT II: HOSTILE WORK ENVIRONMENT ON THE BASIS OF SEX/GENDER DISCRIMINATION AND SEXUAL HARASSMENT

152.      Davenport restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

153.     During her employment with Defendant, Davenport was subjected to offensive and harassing conduct by Davenport's patient based on her sex/gender, as well as sexual harassment from her patient.

154.     Defendant knew or should have known of the harassing conduct against Davenport by her patient.

155.     Defendant condoned, tolerated and ratified this harassing conduct.

**EXHIBIT B**

156.     This harassing conduct was severe and/or pervasive.

157.     This harassing conduct was offensive to Davenport.

158.     This harassing conduct interfered with Davenport's ability to perform her job duties.

159.     Defendant's offensive and harassing conduct created a hostile and/or abusive work environment for Davenport.

160.     Defendant's offensive and harassing conduct created a hostile and/or abusive work environment for the reasonable person similarly-situated to Davenport.

161.     As a direct and proximate result of Defendant's conduct, Davenport suffered and will continue to suffer damages.

## COUNT III: GENDER/SEX DISCRIMINATION IN VIOLATION OF R.C. 4112 et seq.

162.     Davenport restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

163.     Davenport is a member of a statutorily protected class based on her gender/sex under R.C. § 4112 et seq.

164.     Defendant treated Davenport differently than other similarly situated employees based on her gender/sex.

165.     Defendant discriminated against Davenport on the basis of her gender/sex throughout her employment with the company.

166.     During her employment with Defendant, Davenport was subjected to offensive and harassing conduct.

167.     Defendant knew or should have known of the offensive, harassing conduct against Davenport.

15

**EXHIBIT B**

168.     Defendant condoned, tolerated, and ratified this offensive, harassing conduct.

169.     This offensive, harassing conduct was severe and/or pervasive.

170.     This offensive, harassing conduct was offensive to Davenport.

171.     This offensive, harassing conduct would also be offensive to any reasonable person.

172.     This offensive, harassing conduct interfered with Davenport's ability to perform her job duties.

173.     This offensive, harassing conduct was based on Davenport's sex/gender.

174.     This offensive, harassing conduct was so severe and pervasive that it materially altered the conditions of Davenport's employment.

175.     Any reasonable person in Davenport's place would also have no choice but to resign due to the conduct.

176.     Defendant treated Davenport differently than other similarly-situated employees based on her sex/gender.

177.     Davenport, with no other reasonable choice, was then forced to resign her employment.

178.     Davenport's resignation was a constructive termination, an adverse employment action.

179.     Defendant constructively terminated Davenport's employment.

180.     Defendant's discrimination against Davenport based on her gender/sex violates R.C. § 4112 et seq.

181.     As a direct and proximate result of Defendant's conduct, Davenport suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

**EXHIBIT B**

## COUNT IV: GENDER/SEX DISCRIMINATION IN VIOLATION OF TITLE VII

182.     Davenport restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

183.     Davenport is a member of a statutorily protected class based on her gender/sex under Title VII.

184.     Defendant treated Davenport differently than other similarly situated employees based on her gender/sex.

185.     Defendant discriminated against Davenport on the basis of her gender/sex throughout her employment with the company.

186.     During her employment with Defendant, Davenport was subjected to offensive and sexually harassing conduct.

187.     Defendant knew or should have known of the offensive, harassing conduct against Davenport.

188.     Defendant condoned, tolerated, and ratified this offensive, harassing conduct.

189.     This offensive, harassing conduct was severe and/or pervasive.

190.     This offensive, harassing conduct was offensive to Davenport.

191.     This offensive, harassing conduct would also be offensive to any reasonable person.

192.     This offensive, harassing conduct interfered with Davenport's ability to perform her job duties.

193.     This offensive, harassing conduct was based on Davenport's sex/gender.

**EXHIBIT B**

194.     This offensive, harassing conduct was so severe and pervasive that it materially altered the conditions of Davenport's employment.

195.     Any reasonable person in Davenport's place would also have no choice but to resign due to the conduct.

196.     Defendant treated Davenport differently than other similarly-situated employees based on her sex/gender.

197.     Davenport, with no other reasonable choice, was then forced to resign her employment.

198.     Davenport's resignation was a constructive termination, an adverse employment action.

199.     Defendant constructively terminated Davenport's employment.

200.     Defendant's discrimination against Davenport based on her gender/sex violates Title VII.

201.     As a direct and proximate result of Defendant's conduct, Davenport suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT V: RACIAL DISCRIMINATION IN VIOLATION OF R.C. §4112, *et seq.*

202.     Davenport restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

203.     Davenport is African American, and thus is in a protected class for her race.

204.     R.C. § 4112 *et seq*. provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's race.

**EXHIBIT B**

205.     Defendants treated Davenport differently than other similarly situated employees based upon her race.

206.     During her employment with Defendant, Davenport was subjected to offensive and harassing conduct.

207.     Defendant knew or should have known of the offensive, harassing conduct against Davenport.

208.     Defendant condoned, tolerated, and ratified this offensive, harassing conduct.

209.     This offensive, harassing conduct was severe and/or pervasive.

210.     This offensive, harassing conduct was offensive to Davenport.

211.     This offensive, harassing conduct would also be offensive to any reasonable person.

212.     This offensive, harassing conduct interfered with Davenport's ability to perform her job duties.

213.     This offensive, harassing conduct was based on Davenport's race.

214.     This offensive, harassing conduct was so severe and pervasive that it materially altered the conditions of Davenport's employment.

215.     Any reasonable person in Davenport's place would also have no choice but to resign due to the conduct.

216.     Defendant treated Davenport differently than other similarly-situated employees based on her race.

217.     Davenport, with no other reasonable choice, was then forced to resign her employment.

218.     Davenport's resignation was a constructive termination, an adverse employment action.

19

**EXHIBIT B**

219.    Defendant constructively terminated Davenport's employment.

220.    Defendant's constructive termination of Davenport's employment was an adverse employment action against her.

221.    Defendants violated R.C. § 4112 *et seq*. by constructively terminating Davenport's employment because of her race.

222.    Defendants violated R.C. § 4112.02 *et seq*. by treating Davenport differently from other similarly situated employees outside her protected class.

223.    Defendants violated R.C. § 4112.02 *et seq*. by applying its employment policies in a disparate manner based on Davenport's race.

224.    Defendants violated R.C. § 4112.02 *et seq*. by applying its disciplinary policies in a disparate manner based on Davenport's race.

225.    As a direct and proximate result of Defendant's acts and omissions, Davenport has suffered and will continue to suffer damages.

## COUNT VI: RACIAL DISCRIMINATION IN VIOLATION OF TITLE VII

226.    Davenport restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

227.    Davenport is African American, and thus is in a protected class for her race.

228.    Title VII provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's race.

229.    Defendant treated Davenport differently than other similarly situated employees based upon her race.

230.    During her employment with Defendant, Davenport was subjected to offensive and harassing conduct.

20

**EXHIBIT B**

231.     Defendant knew or should have known of the offensive, harassing conduct against Davenport.

232.     Defendant condoned, tolerated, and ratified this offensive, harassing conduct.

233.     This offensive, harassing conduct was severe and/or pervasive.

234.     This offensive, harassing conduct was offensive to Davenport.

235.     This offensive, harassing conduct would also be offensive to any reasonable person.

236.     This offensive, harassing conduct interfered with Davenport's ability to perform her job duties.

237.     This offensive, harassing conduct was based on Davenport's race.

238.     This offensive, harassing conduct was so severe and pervasive that it materially altered the conditions of Davenport's employment.

239.     Any reasonable person in Davenport's place would also have no choice but to resign due to the conduct.

240.     Defendant treated Davenport differently than other similarly-situated employees based on her race.

241.     Davenport, with no other reasonable choice, was then forced to resign her employment.

242.     Davenport's resignation was a constructive termination, an adverse employment action.

243.     Defendant constructively terminated Davenport's employment.

244.     Defendant's constructive termination of Davenport's employment was an adverse employment action against her.

**EXHIBIT B**

245.     Defendants violated R.C. § 4112 *et seq.* by constructively terminating Davenport's employment because of her race.

246.     Defendant violated Title VII by treating Davenport differently from other similarly situated employees outside her protected class.

247.     Defendant violated Title VII by applying its employment policies in a disparate manner based on Davenport's race.

248.     Defendant violated Title VII by applying its disciplinary policies in a disparate manner based on Davenport's race.

249.     As a direct and proximate result of Defendant's acts and omissions, Davenport has suffered and will continue to suffer damages.

## COUNT VII:  RETALIATION

250.     Davenport restates each and every prior paragraph of this complaint, as if it were fully restated herein.

251.     As a result of the Defendant's discriminatory conduct described above, Davenport complained of the discrimination, sexual harassment, and disparate treatment she was experiencing.

252.     Subsequent to Davenport's complaints to Defendant, Defendant took adverse employment actions against Davenport, including, but not limited to, constructively terminating her employment.

253.     Defendant's actions were retaliatory in nature based on Davenport's opposition to the unlawful discriminatory conduct and sexual harassment.

**EXHIBIT B**

254.     Pursuant to R.C. § 4112.02(I) and Title VII, it is an unlawful discriminatory practice to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice.

255.     As a direct and proximate result of Defendant's retaliatory discrimination against and discharge of Davenport, she has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## DEMAND FOR RELIEF

WHEREFORE, Davenport demands from Defendant the following:

a)  Issue a permanent injunction:

   i.   Requiring Defendant to abolish discrimination, harassment, and retaliation;

   ii.  Requiring allocation of significant funding and trained staff to implement all changes within two years;

   iii. Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

   iv.  Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

   v.   Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

b)  An award against Defendant for compensatory and monetary damages to compensate Davenport for physical injury, physical sickness, lost wages, emotional distress, and

**EXHIBIT B**

other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

c) An award of punitive damages against Defendant in an amount in excess of $25,000;

d) An award of reasonable attorneys' fees and non-taxable costs for Davenport's claims as allowable under law;

e) An award of the taxable costs of this action; and

f) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

/s/ Evan R. McFarland
Evan R. McFarland (0096953)
Matthew G. Bruce (0083769)
    Trial Attorney
Brianna R. Carden (0097961)
**SPITZ, THE EMPLOYEE'S LAW FIRM**
Spectrum Office Tower
11260 Chester Road, Suite 825
Cincinnati, OH 45246
Phone: (216) 291-0244 x173
Fax:   (216) 291-5744
Email: Matthew.Bruce@SpitzLawFirm.com
Email: Evan.McFarland@SpitzLawFirm.com
Email: Brianna.Carden@SpitzLawFirm.com

Attorneys for Plaintiff Terri Davenport

24

**EXHIBIT B**

## **JURY DEMAND**

Plaintiff Terri Davenport demands a trial by jury by the maximum number of jurors permitted.

/s/ Evan R. McFarland_____
Evan R. McFarland (0096953)

**EXHIBIT B**